BLECHER & COLLINS, P.C.
Maxwell M. Blecher (State Bar No. 26202)
    mblecher@blechercollins.com
Maryann R. Marzano (State Bar No. 96867)
    mmarzano@blechercollins.com
Courtney A. Palko (State Bar No. 233622)
    cpalko@blechercollins.com
515 South Figueroa Street, Suite 1750
Los Angeles, California 90071
Telephone: (213) 622-4222
Facsimile: (213) 622-1656

Attorneys for Plaintiff
MGA ENTERTAINMENT, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| MGA ENTERTAINMENT, INC., <br><br> Plaintiff, <br><br> vs. <br><br> MATTEL, INC. and ROBERT A. ECKERT, <br><br> Defendants. | CASE NO. **CV11 - 01063** JHN (AJWx) <br><br> **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** <br><br> **1. SHERMAN ACT (15 U.S.C. § 2)** <br> **2. ABUSE OF PROCESS** <br> **3. BUSINESS & PROFESSIONS CODE § 17043** <br><br> (DEMAND FOR JURY TRIAL) |

Plaintiff MGA Entertainment, Inc. ("MGA") files this Complaint against Defendants Mattel, Inc. ("Mattel") and its CEO Robert A. Eckert to secure damages from and injunctive relief against those Defendants based on their violation of Section 2 of the Sherman Act (15 U.S.C. § 2) and Section 17043 of the California Business & Professions Code, and alleges as follows:

## I.

## PARTIES

1.     Plaintiff MGA is a California corporation organized and existing under the laws of the State of California, with its principal place of business in Van Nuys, California.

1        2.      Defendant Mattel is a Delaware corporation with its principal place of

2   business in El Segundo, California.

3        3.      Defendant Robert Eckert, a resident of this judicial district, currently

4   serves as Chairman of the Board and Chief Executive Officer of Mattel, and has

5   since May 2000.

6                            **II.**

7                **<u>JURISDICTION AND VENUE</u>**

8        4.      This Complaint is filed and these proceedings are instituted against

9   Mattel and Mr. Eckert under Section 2 of the Sherman Antitrust Act (15 U.S.C. § 2),

10   and Sections 4 and 16 of the Clayton Antitrust Act (15 U.S.C. §§ 15, 26,

11   respectively) to recover damages for, and injunctive relief against, Mattel and Mr.

12   Eckert for injuries to the business and property of MGA.  This Court has original

13   jurisdiction over the federal antitrust claims pursuant to 28 U.S.C. § 1337 and

14   supplemental jurisdiction over the state law claim.

15        5.      Defendant Mattel maintains headquarters, transacts business, maintains

16   factories and sells products to major customers located within the Central District of

17   California.

18        6.      The interstate trade and commerce involved and affected by the alleged

19   violations of the antitrust laws was carried on in part within this district and some of

20   the unlawful acts described herein were conceived, performed or made effective

21   within this district.  Venue is proper in this district pursuant to 15 U.S.C. § 15(a) and

22   28 U.S.C. § 1391.

23        7.      The Court has jurisdiction over this case as a stand-alone Complaint.  In

24   <u>Hydranautics v. FilmTec Corp.</u>, 70 F.3d 533, 536 (9th Cir. 1995), the Ninth Circuit

25   held that an antitrust claim alleging that the underlying litigation itself constituted

26   the antitrust violation was **not** a compulsory counterclaim in that litigation.

27   ///

28   ///

### III.

## SUMMARY OF THE CASE

8.     Since 1959, Barbie had been, by a wide margin, the dominant fashion doll in the world, enjoying overwhelming market share and shattering all potential competition.  Barbie has been the main reason for Mattel's immense success and growth, accounting for nearly $2 billion in annual sales by the late 1990s, about one-third of Mattel's total sales and nearly 50% of Mattel's profit.

9.     The 2001 entry of Bratz by MGA into the market challenged Barbie's half-century domination of the fashion doll market.  As the Ninth Circuit recently noted in reversing the equitable relief granted to Mattel against MGA:

> Barbie was the unrivaled queen of the fashion-doll market throughout the latter half of the 20th Century.  But 2001 saw the introduction of Bratz . . . and Bratz became an overnight success.  Mattel, which produces Barbie, didn't relish the competition.

Mattel, Inc. v. MGA Entm't, Inc., 616 F.3d 904, 907 (9th Cir. 2010) ("the Mattel litigation").

10.     By the end of 2003 and early 2004, the reality of Mattel's inability to compete had set in.  In the face of still competition from MGA's new line of Bratz fashion dolls, and according to Mattel's own internal documents, its executives were in a full-blown panic, concluding that "the House is on Fire," a document distributed to the Mattel Board of Directors to secure their consent to initiate the litigation against Carter Bryant. Mattel documents also recorded that the "Brand [Barbie] is in Crisis," These concerns were based on the fact that Barbie's market share had plummeted at a "chilling rate," while the Bratz share was skyrocketing.  As Mattel's senior executives lamented in early 2004, "we have been out-thought and out-executed."  Having been, by its own admission, "out-thought and out-executed" in the market by MGA, and with Barbie losing market share "at a chilling rate" to

1  Bratz, Mattel, under the direction and authorization of Mr. Eckert, developed and

2  deployed a strategy to "Kill Bratz" through a multi-front assault by whatever means

3  necessary.  Mattel implemented its strategy by conducting "attacks" through the use

4  of tactics which included the self-titled "Operation Cast Doubt on Bratz," "Defcon 1

5  Alert" and "Litigate MGA to Death."

6       11.    This collective "Kill Bratz" strategy, ordered and authorized by Mr.

7  Eckert, consisted, in part, of anticompetitive practices such as: (a) infiltrating

8  confidential competitor showrooms, accessing industry events with false

9  identification and representing sham toy retailers made up by Mattel in order to get

10  an illicit preview of new Bratz products before they hit the market so that Mattel

11  could imitate or copy them; (b) rearranging Barbie/Bratz displays at key retailers

12  such as Wal-Mart to disadvantage Bratz; (c) pricing products below cost to block

13  Bratz's access to the market; (d) intimidating and threatening licensees, retailers and

14  suppliers with loss of Mattel business if they dealt with MGA; and (e) paying

15  retailers around the globe not to buy Bratz or MGA products.  To implement

16  "Operation Cast Doubt on Bratz," Mattel, among other things, spread derogatory and

17  negative statements about MGA and Bratz on a global basis, all in an effort to cause

18  retailers to lose confidence in MGA's product.

19       12.    Merely imitating Bratz and oppressing MGA's competitive efforts were

20  not enough for Mattel to stem the tide.  Therefore, Mattel turned to the courts for

21  relief.  According to Mattel's own employees, "[t]here [were] competitive issues

22  such as Bratz that were forcing the decline of Barbie. . . . [O]ne of the strategies for

23  trying to defeat Bratz was to litigate [MGA] to death."

24       13.    Mattel CEO, Robert Eckert, embraced the "litigate MGA to death"

25  strategy – a whatever it takes process Mattel successfully employed to destroy the

26  approximate $1 billion net worth of MGA, as well as the "Kill Bratz" and

27  "Operation Cast Doubt on Bratz" battle plan to poison MGA in the marketplace.

28       14.    Carrying out this scorched earth strategy, Mattel filed claims against

1    MGA, and MGA is informed and believes that Mattel spent over $270 million (and

2    counting) in attorneys' fees in an effort to drain MGA of its ability to compete.

3    Mattel's litigation strategy involved launching thousands of discovery requests,

4    taking needless depositions and filing hundreds and hundreds of motions.  Indeed,

5    by the time of trial in the Mattel litigation, the federal docket had over 3,800 docket

6    entries, making it one of the largest (and certainly most expensive) cases ever

7    litigated.  The docket has now swollen to over 8,800 entries as Mattel continues to

8    scorch the earth in this litigation.

9         15.    Despite a stinging rebuke by the Ninth Circuit Court of Appeals,

10   Mattel's "litigate MGA to death" strategy continues to this very day, with Mattel

11   continually adding new claims and making additional challenges to MGA's attempt

12   to enter and compete in the fashion doll market.

13        16.    This is far from the first time that Mattel has tried litigation instead of

14   competition to protect Barbie's monopolistic perch.  Mattel and its counsel Quinn

15   Emanuel have a well-earned reputation for overzealously suing anyone who had the

16   temerity to enter the fashion doll market.  Indeed, a California court found it to be

17   "substantially true" that "Mattel aggressively defends against any entries in the

18   fashion doll business and 'anyone who makes an 11 ½ inch fashion doll paints a

19   target on their back.'"  Mattel, Inc. v. Luce, Forward, Hamilton & Scripps, 2001 WL

20   1589175, at *9 (Cal. Ct. App. Dec. 13, 2001).

21        17.    Courts have recognized that Mattel is not only willing to file litigation,

22   but to abuse it, to gain commercial advantage.  For example, in Mattel v. Walking

23   Mountain Prods., 353 F.3d 792 (9th Cir. 2003), the Ninth Circuit sanctioned Mattel

24   $1.6 million for issuing subpoenas that the Court concluded "were served for the

25   purpose of getting the [parties] to exert pressure on the witnesses not to testify,"

26   noting that these subpoenas were unfortunately part of a "'pattern . . . [of] oppressive

27   subpoena requests,'" and concluding that the subpoenas served by Quinn Emanuel

28   were "'served for the purpose of annoying and harassment and not really for the

1    purpose of getting information.'" Id. at 813-14.

2         18.   As part of its declared war on Bratz and MGA, and through its take no

3    prisoners litigation strategy, Mattel sought and initially secured relief that included

4    the imposition of a constructive trust (and the appointment of a receiver to

5    administer MGA) over virtually all of MGA's trademarks using the words "Bratz"

6    or "Jade." At the time, these assets were worth nearly $1 billion and, as even the

7    district court noted, were comprised almost exclusively of value created by MGA

8    and its CEO Isaac Larian. Mattel pursued a result so extreme that **no** objective

9    litigant could have expected it to survive full judicial review.

10              The very broad constructive trust the district court imposed

11              must be vacated . . . [because] the value of the trademarks

12              the company eventually acquired for the entire Bratz line

13              was   significantly   greater   because   of   MGA's   own

14              development efforts, marketing and investment. The district

15              court nonetheless transferred MGA's entire Bratz trademark

16              portfolio to Mattel. . .As a result, Mattel acquired the fruit of

17              MGA's hard work. . .

18   Mattel, 616 F.3d at 910.

19        19.   Mattel pursued a baseless, overreaching remedy despite the applicable

20   law. As the Ninth Circuit stated:

21              When the value of the property held in trust increases

22              significantly because of a defendant's efforts, a constructive

23              trust that passes on the profit of the defendant's labor to the

24              plaintiff usually goes too far. . . MGA added tremendous

25              value by turning the idea into products and, eventually, a

26              popular and highly profitable brand. The value added by

27              MGA's hard work and creativity dwarfs the value of the

28              original ideas Bryant brought with him.

1   Id. at 911.

2       20.   Mattel knew that the remedy it sought went "too far" but Mattel knew it

3   was the surest and most effective way to "Kill Bratz."  Accordingly, Mattel

4   purposefully sought this remedy in bad faith knowing no **reasonable** litigant could

5   expect to ultimately prevail.  Indeed, the Ninth Circuit found the very broad

6   constructive trust that Mattel sought was an abuse of discretion.  It was, therefore,

7   vacated:

8           It is not equitable to transfer this billion dollar brand – the

9           value of which is overwhelmingly the result of MGA's

10          legitimate efforts – because it may have started with two

11          misappropriated names.  The district court's imposition of a

12          constructive trust forcing MGA to hand over its sweat equity

13          was an abuse of discretion and must be vacated.

14  Id.

15      21.   The Ninth Circuit vacated all the equitable relief that Mattel had sought.

16  Id. at 918.  In fact, the Ninth Circuit concluded that:

17          [t]he district court abused its discretion in transferring the

18          entire Bratz trademark portfolio to Mattel.   We therefore

19          vacate   the   constructive   trust,   UCL   injunction   and

20          declaratory judgment concerning Mattel's rights to the Bratz

21          trademarks.

22  Id. at 917.

23      22.   With respect to the copyright injunction that Mattel sought, the Ninth

24  Circuit further found that that was erroneous and not based on "appropriate findings"

25  and the Ninth Circuit "therefore vacate[d] the copyright injunction."  Id.  Describing

26  the error as "significant," the Ninth Circuit stated: "Mattel can't claim a monopoly

27  over fashion dolls with a bratty look or attitude, or dolls sporting trendy clothing –

28  these are all unprotectable ideas."  Id. at 916.

23.    Indeed, the Ninth Circuit stated: "it's likely that a significant portion –
if not all – of the jury verdict and damage award should be vacated, and the entire
case will probably need to be retried." Id. at 918.  Thereafter, the district court did,
in fact, vacate the judgment and the damage award completely.

24.    Mattel did not care whether it ultimately prevailed because the
imposition of the "very broad constructive trust" (Mattel, 616 F.3d at 910) itself was
a death blow to Bratz and MGA.  In fact, despite MGA's best efforts, its Bratz brand
relaunch is essentially unsuccessful, resulting in a dismal portion of what it once
was.  The scorched earth litigation strategy and a favorable interim ruling are all
Mattel really cared about, not the legal merits or whether the outcome would
ultimately survive an appeal.  Mattel recognized that the interim ruling itself would
cause MGA to incur irreparable damage, destroying MGA's business and its
relationships with its licensees, retailer customers, creditors and suppliers, as they
would not continue doing business with MGA, and would be required to litigate
claims with third parties which otherwise would not have been required.

25.    Even the specter of the constructive trust was a blow to MGA, as it put
MGA's ownership of the trademarks in question and threatened a far broader range
of Bratz products than the copyright claim alone, including products produced by
licensees.  To this end, and consistent with Mattel's practice of putting clouds over
MGA and its product lines, Mattel continues to make claims relating to "Moxie" that
are deliberately intended to cause uncertainty and doubt in the minds of retailers and
distributors, and which will reduce sales.

26.    Mattel knew that merely obtaining that interim order would eliminate
the dreaded competition.  And it has.  Barbie market shares are up again.  In short,
the sole objective Mattel had in seeking this overreaching and erroneous remedy was
not to ultimately prevail on the merits, because Mattel absolutely knew that such a
ruling was not legally supportable and could not be sustained on appeal, but merely
to get the ruling – indifferent to the ultimate outcome – because once granted, Mattel

1  would have won the war.

2      27.   Mattel's conduct is "actually nothing more than an attempt to interfere

3  directly with the business relationships of a competitor." Eastern Railroad

4  Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 144 (1961).  As a

5  consequence, Mattel is not entitled to protection against antitrust scrutiny under the

6  Noerr-Pennington doctrine.

7      28.   Moreover, Mattel is not entitled to any Noerr protection because of its

8  serious and deliberate misrepresentations to the court and in deposition testimony in

9  the course of the litigation.  Clipper Exxpress v. Rocky Mountain Motor Tariff

10 Bureau, Inc., 690 F.2d 1240, 1261 (9th Cir. 1982); Liberty Lake Invs., Inc. v.

11 Magnuson, 12 F.3d 155, 159 (9th Cir. 1993); Kottle v. Northwest Kidney Centers,

12 146 F.3d 1056, 1060-62 (9th Cir. 1998); Freeman v. Lasky, Haas & Cohler, 410

13 F.3d 1180, 1183-84 (9th Cir. 2005); U.S. ex rel. Wilson v. Maxxam, Inc., No. 06-

14 7497, 2009 WL 322934 (N.D. Cal. Feb. 9, 2009).  Mattel is liable for pursuing

15 baseless litigation in bad faith to destroy the only entity that has ever successfully

16 challenged Barbie.

17     29.   Finally, Mattel is not entitled to Noerr protection because the litigation

18 against MGA was part and parcel of an overall unlawful and calculated scheme to

19 monopolize the fashion doll market.  Clipper Express, 690 F.2d at 1263.

20     30.   Mattel has made, among others, the following misrepresentations to the

21 court in the Mattel litigation:

22          a.   Mattel affirmatively misrepresented, and then deliberately

23 concealed by erroneously claiming privilege and withholding production of key

24 documents, the date on which it first learned that Carter Bryant, its former employee,

25 did the drawings of Bratz, and Mattel thereby knowingly secured a favorable ruling

26 on the statute of limitations over claims which it **knew** were, in truth, statute barred.

27          b.   In the face of vigorous objections by MGA, Mattel affirmatively

28 represented at the final pretrial conference that it was not seeking to acquire the

1    proprietary rights to the name "Bratz" and not making a trademark claim with

2    respect to the name "Bratz" for Mattel.  Rather, Mattel asserted that it only sought to

3    reference the name "Bratz" during the Phase 1 trial to establish when Mr. Bryant

4    conceived the idea for the Bratz dolls generally.  Despite this express representation,

5    Mattel then reversed itself and actively sought to use a factual determination on the

6    Phase 1 verdict form concerning when the Bratz designer thought of the name as a

7    basis for securing a ruling that Mattel had the rights to the name "Bratz" and was

8    therefore entitled to a transfer from MGA of all of its trademarks using the name

9    "Bratz" – worth approximately $1 billion, as set forth above.  (See Mattel's Notice

10   of Motion for Constructive Trust of 9/29/08, ¶ 1 (Dkt. No. 4305).)

11              c.     Mattel represented to the Court in the Mattel litigation (i) that

12   MGA had concealed from Mattel material aspects of the Omni transaction and the

13   source of the funds being used by Omni; and (ii) that MGA had impermissibly

14   encumbered the rights to Bratz after the verdict.  These claims were and are patently

15   false.  At his deposition, Mr. Eckert, CEO of Mattel, confirmed that his friend, Neil

16   Kadisha of Omni 808, had told him personally that Omni 808 was buying the debt.

17   Notwithstanding Mattel's knowledge of this falsity, Mattel's Fourth Amended

18   Counterclaim repeats these same false charges.  Mattel abused litigation to go on a

19   fishing expedition, harassing MGA's creditor for no reason.  The entire purported

20   basis for Mattel's claims with respect to Omni was that MGA was using Omni to get

21   priority over Mattel's judgment.  The problem with Mattel's logic – as MGA pointed

22   out in the very first receiver motion – is that Mattel never had a judgment.  All

23   Mattel had was a verdict, and Mattel's lawyers are sophisticated enough to know the

24   difference.  Indeed, this Court agreed, granting MGA's motion to dismiss Omni and

25   the Omni-related claims from the case.  (See September 3, 2010 Order Granting

26   IGWT 826's Motion for Judgment on the Pleadings at 10 ("Indeed, in light of the

27   Ninth Circuit's July 22, 2010 Order, Mattel lacks now, and may never obtain, a

28   judgment against MGA.  Any dispute between Mattel and MGA's creditors,

1   including IGWT, is not definite, concrete, real, substantial, or immediate.  IGWT's

2   Motion is GRANTED as to the seventeenth counterclaim.")  Undeterred and in

3   disregard of Judge Carter's written opinion and oral explanation, and as part of

4   Mattel's campaign of intimidation and of litigating MGA to death, Mattel, through

5   the same lawyers, filed a baseless and frivolous new lawsuit in state court against

6   MGA, Isaac Larian, Larian family trusts and Omni 808.

7           d.    Mattel made misrepresentations to the Court to obtain duplicative

8   damages on its state tort claims.  At the jury instruction charging conference,

9   counsel for Mattel expressly assured the Court, over MGA's strenuous objections

10  that Mattel would not actually seek duplicative damages, even though Mattel's

11  proposed jury instructions explicitly asked the jury to do precisely that.  Rather,

12  Mattel agreed that there necessarily would be duplication and that the Court would

13  have to adjust the verdict to eliminate that duplication.  (8/14/08 Tr. at 7477:10-19

14  (Dkt. No. 6343); MGA's Responses to Mattel's Objections to MGA's Revised

15  Disputed [Proposed] Phase 1-B Jury Instructions at 110-11 (Dkt. 4166); 8/20/08 Tr.

16  at 7893:25-7894:24; 8251:25-8252:2 (Dkt. No. 6346).)  Yet, when the jury returned

17  a disappointing verdict ($20 million against MGA and $10 million against Larian)

18  that awarded less than one percent of what Mattel had requested (and, even as to that

19  number, two-thirds of which was duplicative and had to be reduced), Mattel

20  repudiated its earlier representations to the Court and argued for applying the $30

21  million total dollar amount awarded to **each** of the separate tort claims, thus

22  aggregating and duplicating the damages to $90 million, when the true damages

23  should have been no more than $30 million (and, as explained below, even this

24  figure itself would have to be reduced to eliminate duplication).  (See Mattel's

25  Opposition to Remittitur at 9 (Dkt. No. 4684); 2/11/09 Tr. at 50:12-25 (Dkt. No.

26  5640).)

27           e.    Mattel made misrepresentations to the Court to obtain duplication

28  of damages on its claims against MGA and Isaac Larian.  Mattel's damages theory at

1  trial was that it was entitled to force MGA and Isaac Larian to disgorge any profits

2  they earned from the sale of Bratz.  Because Mr. Larian never sold Bratz, the only

3  Bratz-related profits that he received were through distributions made to him from

4  MGA of its profits.  Mattel readily conceded during expert testimony, and in express

5  representations to the Court, that the damages Mattel sought against Mr. Larian were

6  duplicative of the damages awarded against MGA.  (8/7/08 Tr. at 6412:23-6413:3,

7  14-16; 6413:23-6414:1, 10-13 (Dkt. No. 6339); 8/7/08 Tr. at 6296:2-6 (Dkt. No.

8  5581); 8/14/08 Tr. 7480:23-7482:8 (Dkt. No. 6343); 8/20/08 Tr. at 8136:8-18 (Dkt.

9  No. 5615).)  Yet, in the face of the disappointing verdict, Mattel repudiated its

10  earlier concession and argued that the MGA and Larian damage awards were **not**

11  duplicative.  (Mattel's Opposition to Remittitur at 20-21 (Dkt. No. 4684).)

12       f.     In addition, Mattel and its counsel intentionally withheld and

13  suppressed evidence from MGA and the Court that would have otherwise

14  significantly changed the outcome of the rulings in the case and the outcome of

15  Phase I, and by such conduct, Mattel wasted considerable judicial time and expense.

16       g.     Several Mattel executives gave false testimony in depositions,

17  including, without limitation, Matthew Bousquette and Defendant Robert A. Eckert.

18       31.    These misrepresentations were part and parcel of Mattel's litigation

19  strategy to "Kill Bratz" and successfully decimate a company having a capitalized

20  value of nearly $1 billion.

21                                    **IV.**

22                        **FACTUAL BACKGROUND**

23       32.    MGA will establish that Mattel, under the direction and authorization of

24  Mr. Eckert, specifically intended to eliminate MGA as a competitor in the fashion

25  doll market, long dominated and controlled by Mattel's Barbie, so that Mattel could

26  reacquire and maintain a monopoly in the fashion doll market in the United States.

27       33.    MGA brings this action to stop Mattel's unlawful anticompetitive

28  conduct and to recover the extensive damage that Mattel's illicit behavior has

1  caused, and continues to cause, MGA. As the Ninth Circuit concluded: "America
2  thrives on competition; Barbie, the all-American girl, will too." Mattel, 616 F.3d at
3  918.

4      34.    Mattel is the world's largest toy company and it owes its immense
5  success chiefly to a single product: Barbie. Since her debut in 1959, Barbie has been
6  the fuel for Mattel's growth and success, turning Mattel into an international
7  powerhouse. By the late 1990s, Mattel's annual sales of the doll and related
8  products approached or topped $1.8 billion and Mattel stock reached a record high
9  of approximately $45 per share. At that time, the average American girl had eight
10 Barbie dolls, and Barbie was the world's best-selling toy. Mattel had relied on
11 Barbie to provide one-third (1/3) of its revenue and fifty percent (50%) of its profit.
12 According to the research firm NPD Group, which measures toy industry market
13 share, Mattel's share was over 90% of the fashion doll market.

14     35.    *Then came the competition* – MGA's Bratz.

15     36.    Bratz challenged Barbie's half-century domination of the fashion-doll
16 market like nothing ever before had been able to do.

17     37.    MGA is a privately held company located in the San Fernando Valley
18 that began in 1979 as a small consumer electronics business. In 1987, the company
19 made its first foray into the toy business when it secured rights to market handheld
20 LCD games featuring licensed Nintendo® characters. Building on that small
21 success, the company began marketing products for popular licensed properties such
22 as the "Power Rangers,"® "Hello Kitty"® and even Barbie, Uno and Othello from
23 Mattel. In June 2001, this little-known but successful company was propelled into
24 the limelight after its daring release of an innovative line of Bratz fashion dolls, a
25 collection of multi-ethnic fashion dolls that sport a fresh new urban and
26 contemporary look and style. Within only a few years, Bratz devastated Barbie's
27 dominance of the fashion doll market and acquired a market share equal to or in
28 excess of Barbie, which caused panic within Mattel and resulted in a strategy to

1  "Kill Bratz."

2      38.    Mattel has not taken kindly to the challenge presented by MGA. Either

3  unable or unwilling to compete against Bratz fairly and on a level playing field,

4  Mattel has instead taken a far more aggressive and expeditious approach, resorting

5  to unfair and anticompetitive business practices, including the pursuit of baseless

6  litigation remedies in bad faith. Wielding its substantial clout and influence in the

7  toy industry, Mattel has tried to muscle MGA out of business. Mattel has

8  intimidated, coerced and threatened retailers, licensees, suppliers and others in the

9  industry – both in the U.S. and internationally – in order to inhibit and stifle MGA's

10  ability to compete with Mattel and to prevent MGA from obtaining licensees,

11  contracts and supplies for its products. Mattel has also serially imitated and copied

12  the look of MGA products, trade dress, trademarks, themes, concepts, advertising

13  and packaging, including those for the Bratz line of dolls. Without consent, Mattel

14  has repositioned and rearranged the location and display of Bratz dolls at Wal-Mart

15  stores and other retailers. Mattel has also sold Wee 3 Friends at prices below its

16  fully allocated cost in violation of California Business & Professions Code § 17043.

17  By doing so, Mattel, was able to send MGA's highly successful 4-Ever Best Friends

18  doll to the veritable garbage bin and "kill it."

19      39.    MGA unveiled a preliminary sample of the Bratz doll at the Hong Kong

20  Toy Fair in January 2001, while continuing to finalize the product throughout that

21  spring. At that toy fair, which Mattel attended, MGA invited Mattel to look at and

22  consider distributing Bratz in Latin America. Mattel declined. Finished Bratz

23  products were first shipped in May 2001, and MGA introduced the line to consumers

24  in June 2001.

25      40.    Unlike Barbie dolls, the Bratz line of dolls and branded products

26  sported a hip, multi-ethnic urban look that appealed to contemporary teenage and

27  preteen girls.

28      41.    At approximately 9.5 to 10 inches tall, Bratz dolls were intentionally

1  shorter than Barbie dolls and looked like no other, with disproportionately large

2  heads; big, dramatic eyes and lips; small, thin bodies; oversized feet (to emphasize

3  shoe fashion and to stand on their own, unlike Barbie, which requires a stand); and

4  sporting current, cutting-edge fashions.

5      42.    Indeed, the classic Barbie look was nowhere to be seen in these dolls;

6  they would never be confused with Barbie.

7      43.    Featuring and embodying the slogan "The Girls With a Passion for

8  Fashion!," Bratz dolls revitalized, transformed and expanded the fashion doll

9  market.

10      44.    The Bratz line – with its unique and distinctive look – is well

11  recognized and has been critically acclaimed and praised by consumers, retailers and

12  toy industry analysts alike.  In 2001, the Bratz line won the Toy Industry Association

13  ("TIA") People's Choice Toy of the Year Award, the Family Fun Toy of the Year

14  Award and Toy Wishes Hot Pick Award.  In 2002, the Bratz line again won the TIA

15  People's Choice Toy of the Year Award and the Family Fun Toy of the Year Award.

16  The licensing industry's official arm, LIMA (Licensing Industry Merchandisers'

17  Assocation), awarded MGA's Bratz the best character license of the year, as well as

18  the overall best licensed property of the year for 2003.  MGA's Bratz also earned the

19  coveted TIA "Property of the Year" and "Girl Toy of the Year" for 2003, as well as

20  the Family Fun Toy of the Year Award.  MSNBC named Bratz the "Hottest Toy of

21  the Year," and both MGA and Bratz received numerous other accolades in 2004,

22  including the Supplier Performance Award by Retail Category (the "SPARC"

23  award) in the Girls' Toys category sponsored by the business publication DSN

24  Retailing Today/Apparel Merchandising.

25      45.    Although merely a tiny fraction of Mattel's size, MGA, with Bratz, was

26  able to chip away at Mattel's stranglehold on the fashion doll market, gaining shelf

27  space and market share as Barbie sales remained flat or, at times, declined.  The

28  competition that MGA and Bratz posed to Mattel was unexpected and not welcomed

1   by Mattel.

2       46.    Mattel was not poised to respond to Bratz with a new, creative product

3   of its own. Indeed, it had been antithetical to Mattel's corporate culture and

4   mentality for Mattel to even conceive that a product might vie for shelf space with

5   Barbie, let alone be available for sale to consumers mere months after first being

6   shown to retailers. Mattel had to take a more cutthroat and expeditious route,

7   favoring barnstorming over brainstorming.

8       47.    Instead of fairly competing on the merits of product, Mattel waged war

9   against MGA using a wide array of tortious, unfair and anticompetitive practices

10   including systematic, serial copying and intellectual property infringement, aided by

11   intimidation, threats and other acts of unfair competition and anticompetitive

12   conduct, and finally with the prosecution of overreaching litigation seeking baseless

13   remedies in bad faith – all with one goal in mind – to banish MGA from the market.

14   **V.**

15   **<u>FIRST CLAIM FOR RELIEF</u>**

16   **Sherman Act Section 2, 15 U.S.C. § 2**

17       48.    MGA repeats and realleges the allegations contained in paragraphs 1

18   through 47 of this Complaint and incorporates them by reference as though fully and

19   completely set forth herein.

20       49.    The statute of limitations in respect to this claim has been tolled by

21   reason of the pendency of <u>MGA Entertainment, Inc. v. Mattel, Inc.</u>, Case No.

22   CV-05-02727 DOC, pending in the Southern Division of this Court before the

23   Honorable David O. Carter.

24       50.    The relevant product market is fashion dolls, which are dolls in the 9-

25   12" tall range and which are designed to be dressed with fashion clothes and

26   accessories. Fashion dolls are purchased almost exclusively by girls, and for these

27   girls there is no reasonably interchangeable substitute for such dolls. Fashion dolls

28   have peculiar characteristics consisting of the doll itself and the fashion clothing and

1   accessories.  Moreover, the toy industry recognizes fashion dolls as a distinct

2   product or subproduct market and maintains statistics and reports separately on

3   market share and other aspects of the fashion doll market or submarket.  Finally, the

4   pricing of fashion dolls is not seriously constrained by the price of any other toy

5   because of the lack of reasonable interchangeability among the purchasers.

6         51.    The relevant geographic market is the United States.

7         52.    Beginning at least with the introduction of Bratz in 2001 and continuing

8   through the present time, Defendant Mattel, acting under the order and authorization

9   of Mr. Eckert, has been violating Section 2 of the Sherman Act by monopolizing and

10  attempting to monopolize the sale and distribution of fashion dolls in the United

11  States.

12        53.    Mattel's scheme and strategy to monopolize the above-described trade

13  and commerce have been done with the specific intent of eliminating competition in

14  general, and the specific competition of MGA, in the fashion doll market.  Until

15  Mattel launched its blitzkrieg on Bratz, MGA had been the most effective and

16  serious competitor of Mattel in the fashion doll market.  Mattel's overall

17  anticompetitive scheme and strategy, some of which appears in "The Bratz Brief"

18  and some of which appears in "Operation Cast Doubt on Bratz," consist of at least

19  the following conduct:

20        a.    Since the Bratz dolls were launched in 2001, Mattel has used

21  fictitious/forged identification to secure protected competitor product information.

22  Mattel has serially imitated and copied many of MGA's products, trade dress,

23  trademarks, themes, concepts, advertising and product packaging including but not

24  limited to: (i) MGA's service mark for "Passion for Fashion"; (ii) Mattel's "Wee 3

25  Friends" copied MGA's "4-Ever Best Friends"; and (iii) as recently as 2010,

26  Mattel's Toy Story 3 toys and fashion doll copied MGA's distinctive trapezoidal

27  packaging trademark, which had acquired a secondary significance for Bratz.

28        b.    Mattel has threatened, manipulated, improperly influenced and

17

intimidated many people and companies, including but not limited to licensees, retailers, distributors, manufacturers, raw good suppliers and industry bodies, to prevent them from working with MGA:

        (i)    Mattel has threatened, bribed or pressured distributors and retailers not to distribute Bratz products, including, without limitation, Kohl's Department Stores;

        (ii)    Mattel has threatened and warned a number of companies not to license MGA properties or risk retribution in that Mattel would cease relations with the company or decline to renew its licensing agreements; and

        (iii)   Mattel has threatened and warned raw good suppliers and toy manufacturers not to supply goods to MGA or to make MGA products; otherwise, they would lose business from Mattel.

        c.    Mattel constantly manipulated NPD data to falsely misrepresent the Barbie versus Bratz market shares.

        d.    Mattel made its employees sign overbroad and repressive intellectual property assignment agreements which constituted unconscionable contracts of adhesion.

        e.    Mattel copied and imitated Bratz television commercials for its My Scene commercials.

        f.    Mattel has intentionally tried to book the same actresses who portrayed the Bratz girls in MGA's commercials in order to interfere with MGA's ability to shoot its own commercials.

        g.    Mattel has sold Wee 3 Friends, a copy of MGA's 4-Ever Best Friends, at prices which are below its fully allocated cost in violation of California Business & Professions § 17043, and in doing so killed 4-Ever Best Friends and then celebrated its death.

        h.    Mattel has tampered with MGA's retail displays at Wal-Mart and Toys "R" Us, replacing MGA product with Mattel product without permission of the

1  retailers.

2        i.     Mattel has intimidated former Mattel employees who have gone

3  to work for MGA by sending them threatening letters, suing them and warning them

4  not to disclose publicly available information about Mattel.

5        j.     Mattel has improperly initiated and influenced criminal

6  investigations of former Mattel employees based on knowingly false information

7  such that this activity is not protected conduct.

8        k.     Mattel has hired a financial consultant firm (Bain & Company)

9  ostensibly to talk to retailers to gather evidence, the true purpose of which is to

10  discourage and dissuade retailers from dealing with MGA.

11        l.     Mattel intentionally and falsely spread or caused to spread press

12  releases that Bratz sexualizes girls and that Bratz dolls say the "F" word (which they

13  do not) as part of Mattel's "Operation Cast Doubt on Bratz" program.

14        m.    Mattel ruthlessly pursued baseless litigation remedies against

15  MGA in bad faith for the reasons set out in paragraphs 9-27 above, which are here

16  realleged with the same force and effect as though set forth in full.

17  **VI.**

18  **EFFECTS OF THE VIOLATION**

19      54.    The purpose of Mattel's anticompetitive conduct, specifically

20  monopolizing and attempting to monopolize the fashion doll market, was to

21  eliminate or suppress the competition, mainly MGA, and effectively deprive fashion

22  doll purchasers of the choice of buying from a Mattel competitor, including MGA.

23  Accordingly, Mattel's conduct has served to reinforce its fashion doll monopoly, and

24  to impair the ability of MGA and others to compete in the relevant fashion doll

25  market.  Consumers are effectively deprived of choice and price competition.  In

26  fact, in the opening statement at trial in the Mattel litigation, Mattel's attorney, John

27  B. Quinn, Esq., told the jury: "Until Bratz, there was only one fashion doll in the

28  market and that was Barbie."

55.     Mattel undertook the actions as alleged herein knowing that significant and high barriers to market entry would prohibit would-be competitors from entering the fashion doll market.  These barriers to entry include, among other things:

        a.      a substantial up-front capital investment required to penetrate the fashion doll market;

        b.      a significant time-lag in developing a reputation such that an entrant's fashion dolls can be successfully marketed to buyers;

        c.      patents, trademark, trade dress, copyright and other intellectual property rights relating to fashion dolls;

        d.      requirement of access to a nationwide sales and distribution network; and

        e.      exclusive dealing contracts already in place.

56.     Mattel's anticompetitive conduct described herein, as ordered and authorized by Mr. Eckert, has produced antitrust injury, and unless restrained, will continue to produce at least the following anticompetitive and exclusionary effects upon competition in interstate commerce:

        a.      competition in the development of fashion dolls has been substantially and unreasonably restricted, lessened, foreclosed and eliminated;

        b.      barriers to entry into the market for fashion dolls have been raised;

        c.      consumers' choice has been, and will continue to be, significantly limited as to selection, price and quality of fashion dolls;

        d.      consumers' access to MGA's competitive products has been and will be artificially restricted and reduced, and its products will continue to be excluded from the market; and

        e.      the market for development and sale of MGA's fashion dolls will continue to be artificially restrained or monopolized.

# VII.

## INJURY TO PLAINTIFF

57.     As a direct and proximate result of Mattel and Mr. Eckert's unlawful conduct described herein, MGA has been injured in its business and property, in that its ability to compete with Mattel in the manner described herein has been seriously impaired, injured and damaged.  As a consequence, MGA has been injured and is continuing to be subject to damages consisting of the loss of goodwill, going concern value and revenues and profits from the sale of its fashion dolls and related products.

58.     Hasbro indicated in negotiations with MGA in 2006 that a fair purchase price for MGA would be $1.1 billion.  Mattel represented to the Court in the Mattel litigation that the value of MGA was at least that amount.  Accordingly, MGA seeks recovery of $1 billion dollars in damages, before trebling.

# VIII.

## SECOND CLAIM FOR RELIEF

### Abuse of Process

59.     MGA repeats and realleges paragraphs 1-58 of this Complaint and incorporates them by reference as though fully and completely set forth herein.

60.     The allegations of paragraphs 9-27 constitute an actionable abuse of process under California law because the remedy sought by Mattel, as ordered and authorized by Mr. Eckert, knowingly required the district judge to enter a ruling which was an abuse of discretion.  Mattel was, therefore, acting in bad faith, thereby entitling MGA to both compensatory and **exemplary** damages.

# IX.

## THIRD CLAIM FOR RELIEF

### California Business & Professions Code § 17043

61.     MGA repeats and realleges the allegations contained in paragraphs 1-60 of this Complaint and incorporates them by reference as though fully and completely

1   set forth herein.

2        62.   Mattel has sold Wee 3 Friends, a copy of MGA's 4-Ever Best Friends,

3   at prices which are below its fully allocated cost in violation of California Business

4   & Professions § 17043.

5                          **PRAYER FOR RELIEF**

6        WHEREFORE, Plaintiff MGA prays that this Court adjudge and decree as

7   follows:

8        1.   That Defendants Mattel and Mr. Eckert have violated Section 2 of the

9   Sherman Act as alleged, and that judgment be entered against Defendants for treble

10  the amount of actual damages suffered by Plaintiff MGA, and that Plaintiff also be

11  entitled to an award of reasonable attorneys' fees and to recover its costs of suit, as

12  required by Section 4 of the Clayton Act.

13       2.   That Defendants Mattel and Mr. Eckert have violated the California law

14  applicable to abuse of process, and that Plaintiff MGA be entitled to compensatory

15  and exemplary damages.

16       3.   That Defendants Mattel and Mr. Eckert have violated Section 17043 of

17  the California Business & Professions Code as alleged, and that judgment be entered

18  against Defendants for treble the amount of actual damages suffered by Plaintiff

19  MGA, and that Plaintiff also be entitled to an award of reasonable attorneys' fees

20  and to recover its costs of suit, as required by Section 17082 of the Unfair Practices

21  Act;

22       4.   That Plaintiff MGA be entitled to such other and further relief as the

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

Court may deem just and proper in the circumstances.

Dated:   February 3, 2011           BLECHER & COLLINS, P.C.
                                    MAXWELL M. BLECHER
                                    MARYANN R. MARZANO
                                    COURTNEY A. PALKO


                                    By:_____
                                        Maxwell M. Blecher
                                        Attorneys for Plaintiff
                                        MGA ENTERTAINMENT, INC.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury pursuant to Federal Rule of Civil Procedure 38(b) (28 U.S.C. Rule 38) and Local Rule 3-6.

Dated:   February 3, 2011          BLECHER & COLLINS, P.C.
                                   MAXWELL M. BLECHER
                                   MARYANN R. MARZANO
                                   COURTNEY A. PALKO


                                   By: _____
                                       Maxwell M. Blecher
                                       Attorneys for Plaintiff
                                       MGA ENTERTAINMENT, INC.

#44080

24